**PORZIO, BROMBERG & NEWMAN, P.C.**
100 Southgate Parkway
P.O. Box 1997
Morristown, New Jersey 07962
(973) 538-4006
(973) 538-5146 Facsimile
Attorneys Appearing: John S. Mairo, Esq.
                     Kelly D. Curtin, Esq.

*Proposed Counsel to Debtors and Debtors-In-Possession*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | : Chapter 11 |
| Somerset Hills Residential Treatment Center, Inc., *et al.*[1], | : Case No.: 14-25202 (CMG) |
| Debtors-in-Possession. | : (Joint Administration Requested) |

# VERIFIED APPLICATION IN SUPPORT OF DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS UNDER SECTIONS 361 AND 363 OF THE BANKRUPTCY CODE APPROVING THE USE OF CASH COLLATERAL, PROVIDING ADEQUATE PROTECTION AND SETTING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

Somerset Hills Residential Treatment Center, Inc. ("RTC") and Somerset Hills School, Inc. ("SHS", together with RTC, the "Debtors"), submit this verified application in support of its motion (the "Motion") for entry of an interim order pursuant to sections 361 and 363 of title 11 of the United Stated Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules") (i) approving the use of cash collateral, (ii) providing adequate protection, and (iii) setting a final hearing pursuant to Rule 4001 of the Bankruptcy Rules. In support of this Motion, the Debtors respectfully represent as follows:

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal identification number are: Somerset Hills Residential Treatment Center, Inc. (1831) and Somerset Hills School, Inc. (9733).

## JURISDICTION

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicates for the relief sought herein are sections 361 and 363 of the Bankruptcy Code and Rule 4001 of the Bankruptcy Rules.

## BACKGROUND

4. On the date hereof (the "Filing Date"), each of the Debtors filed voluntary petitions for relief pursuant to Chapter 11 of the Bankruptcy Code. Since the Filing Date, the Debtors have remained in possession of their assets and continued to manage their businesses in the ordinary course as debtors in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

5. A detailed description of the Debtors' businesses and the facts leading to the Debtors' commencement of their Chapter 11 Cases is set forth in the Affidavit of Ryan Kimmins in Support of the Debtors' First Day Motions (the "Kimmins Affidavit"). Those facts are incorporated herein by reference.

A. The Debtors' Business

6. SHS is a day school for out of district placed classified youth in grades Kindergarten through twelve. Classifications include behavioral/social/emotional disabilities, attention deficit hyperactivity disorder/attention deficit disorder, asperger/autistic spectrum, learning differences, and dyslexia. SHS is approved by the New Jersey Department of Education as a qualified private school.

7. RTC was a residential treatment facility for children classified by the State of New Jersey as behaviorally disabled.

8. For many years, SHS and RTC operated their businesses at 206 Mount Horeb Road, Warren, New Jersey (the "Warren Property"). At the Warren Property, RTC provided residential services to vulnerable children with mental and emotional issues. The residents from RTC also attended SHS. RTC contracted with the State of New Jersey Department of Children and Families ("DCF") to provide such residential services. The latest such contract was Contract 12GBWR (the "Residential Contract") and covered January 1, 2012 through December 31, 2013. When SHS and RTC were fully operational at the Warren Property, the Debtors employed well over two hundred people and had about one hundred students enrolled at SHS with seventy-six students residing in the RTC. When DCF did not renew the Residential Contract in late November 2013, RTC was delivered a death blow. SHS proactively took steps to remain viable. In January 2014, in an effort driven by a desire to "right size" its business and serve its students and employees, SHS moved its school functions to an excellent educational facility, with larger classrooms located at 107 Westervelt Avenue, North Plainfield, New Jersey (the "North Plainfield Property"). SHS is successfully operating its school at the North Plainfield Property and will continue to do so, but legacy issues related to the RTC business and the non-renewal of the Residential Contract has made this bankruptcy filing necessary.

9. As of December 31, 2013, RTC had no employees. As of the Filing Date, SHS has 37 employees, consisting of 35 full-time salaried employees and 2 hourly employees.

B. Relationship With Bank of America, N.A.

10. On or about October 26, 2005, SHS entered into an Amended and Restated Mortgage, Construction and Term Loan in the amount of $3,210,000.00 with Bank of America, N.A. ("BofA") (as amended, "Leasehold Mortgage Loan") as evidenced by, among other things, an Amended and Restated Leasehold Mortgage, Construction and Term Loan Agreement dated

3

October 26, 2005 (as amended, "Leasehold Loan Agreement"). RTC executed a guaranty in connection with the Leasehold Mortgage Loan. The Leasehold Mortgage Loan is secured by the Premises (as defined in the Leasehold Mortgage), which are generally the land, improvements and personal property located at the Warren Property relating to the gym, pool, classroom addition building, and emergency generator building. Under the relevant documents, assuming the default requirements are met, BofA has the right to, among other things, foreclose on the Premises and collect rents/profits from any tenants using the Premises. The Premises, as well as the rest of the Warren Property, are currently being used by Camp Harmony ("Amedeo's Camp Harmony"), which is owned by Mr. Jerome Amedeo, who also owns the company that is the Warren Property landlord, School Realty, LLC t/a Home School Realty, LLC (the "Amedeo Landlord Company"). To give a sense of the value of the Premises that are pledged as collateral to BofA, the construction and related costs for the buildings were over $5.6 million.

11. To manage its interest rate risk in connection with the Leasehold Mortgage Loan, SHS entered into an interest rate swap with BofA which hedged its exposure to floating interest rates. Pursuant to a termination notice, BofA has taken the position that as of the early termination date (June 26, 2014), the termination payment amount due BofA is $254,389.92.

12. On or about March 24, 2009, SHS entered into a $200,000 term loan from BofA (the "2009 Term Loan") as evidenced by, among other things, a Loan Agreement dated March 29, 2009 by and between SHS and BofA ("2009 Loan Agreement").

13. On or about February 25, 2011, SHS entered into a $200,000 term loan from BofA (the "2011 Term Loan" together with the 2009 Term Loan, the "BofA Term Loans") as evidenced by, among other things, a Loan Agreement dated February 25, 2011 by and between SHS and BofA. The BofA Term Loans were utilized to acquire certain equipment for SHS and

4

RTC. To secure their obligations to BofA under the BofA Term Loans, the Debtors granted BofA a security interest in substantially all the assets of the SHS and RTC. Virtually all of the equipment purchased with the BofA Term Loans remains at the Warren Property.

14. As of the Filing Date, the principal amount due to BofA under the above loans is approximately $1.64 million, comprised of $1,512,398.42 for the Leasehold Mortgage Loan, $16,598.95 for the 2009 Term Loan and $110,593.56 for the 2011 Term Loan.

C. <u>SHS's Immediate Need for Use of Cash Collateral</u>

15. As described above, SHS is providing the critical service of educating behaviorally classified children with learning disabilities and/or psychiatric diagnoses from communities throughout New Jersey. To enable SHS to continue fulfilling its mission of giving its students the opportunity to thrive, SHS requires the use of cash collateral for the continuation of its operations without disruption to, *inter alia*, pay (i) its employees, (ii) for supplies as required for running the school, (iii) insurance; and (iv) utility costs. Annexed hereto as **Exhibit A** is a budget (the "<u>Cash Collateral Budget</u>") incorporating SHS's anticipated income and expenses for the thirteen (13) week period beginning with the week ending August 1, 2014 and continuing to the week ending October 24, 2014. Without authorization to use cash collateral in accordance with the Cash Collateral Budget, SHS's operations will cease to the detriment of (i) its behaviorally classified students, (ii) employees, and (iii) creditors.

16. In assessing the Cash Collateral Budget, the Court should take note of several relevant facts detailed in this paragraph, which facts are not readily apparent from a quick review of the Budget. SHS's business is seasonal with the summer months of July and August being the slow months for generating revenue and collections. Pursuant to New Jersey Department of Education regulations, during July and August, SHS can only bill for a total of thirty (30) days.

5

In 2014, during July SHS billed twenty (20) days; during August ten (10) days were billed by SHS. By contrast, in September and October, SHS will be able to bill for nineteen (19) and twenty-two (22) days respectively. Consistent with that, SHS's operating cash flow improves during the Budget period with the last four (4) weeks reflecting a combined positive operating cash flow of over $35,000. Also, fewer students attend SHS during the summer months. If the Budget was normalized for the typical number of billing days and typical number of students, the operating cash flow at the end of the Budget period would be positive.

## RELIEF REQUESTED

17. By this Motion, the Debtors request an order: (i) authorizing the use of the BofA's cash collateral pursuant to the Budget attached hereto as Exhibit A; (ii) granting BofA adequate protection in the form of replacement liens pursuant to sections 361 and 363 of the Bankruptcy Code, to the extent the BofA's cash collateral is used and to the extent of any diminution in the value of the BofA's collateral, with the same priority in the Debtors' post-petition collateral, and proceeds thereof, that the BofA held in the Debtors' prepetition collateral; and (iii) giving notice of and scheduling an interim and final hearing pursuant to Bankruptcy Rule 4001. Moreover, the Debtors believe that BofA has extensive, valuable collateral located at the Warren Property that is worth much more than the debts owed to it by the Debtors and which collateral may be pursued by BofA to pay off its claims.

18. Without the immediate use of cash collateral, SHS will be unable to pay ordinary and necessary business expenses including, but not limited to, payroll and related obligations, utilities, amounts owed to vendors and other suppliers of goods and services, insurance, and other costs of administering their estates. The use of cash collateral as requested herein is therefore critical to preserving the value of the Debtors' estates for all parties-in-interest.

## BASIS FOR RELIEF

19. The Bankruptcy Code provides Chapter 11 debtors-in-possession with the right to use cash collateral to operate their businesses upon satisfaction of certain prerequisite(s). Pursuant to section 363(c)(2) of the Bankruptcy Code:

> The trustee [or debtor-in-possession] may not use, sell, or lease cash collateral under paragraph 1 of this subsection, unless - (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

20. The "provisions of this section" referred to in section 363(c)(2)(B) quoted above includes section 363(e), which provides:

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest.

11 U.S.C. § 363(e). That is, to the extent necessary, adequate protection is to be provided to a party with an interest in property sought to be used by a debtor to balance a debtor's required use of cash collateral and the rights of parties holding an interest in that cash collateral.

21. What constitutes adequate protection is determined on a case-by-case basis. *See In re Swedeland Development Group, Inc.,* 16 F.3d 552, 564 (3rd Cir. 1994); *In re O'Connor,* 808 F.2d 1393, 1396-97 (10th Cir. 1987). Adequate protection can be provided in a number of ways under section 361 of the Bankruptcy Code, with the focus being to protect a secured creditor from any diminution in the value of its interest in the collateral during the period of its use post-petition. *See Swedeland*, 16 F.2d at 564-565; *see also In re Cann & Saul Steel Co.,* 76 B.R. 479 (Bankr. E. D. Pa. 1987); *In re Dunes Casino Hotel,* 69 B.R. 784, 793 (Bankr. D.N.J. 1986)

7

("Adequate protection is designed to preserve the secured creditor's position at the time of the bankruptcy."). Regardless of the form of adequate protection given, "the entitlement to and measure of adequate protection is always determined by the extent of the anticipated or actual decrease in the value of the secured creditor's collateral during the bankruptcy case." *In re Gallegos Research Grp., Corp.,* 193 B.R. 577, 584 (Bankr. D. Colo. 1995). Although section 361 of the Bankruptcy Code sets forth three non-exclusive methods of how an interest in property may be adequately protected, "adequate protection" is not defined in the Bankruptcy Code. *Swedeland,* 16 F.2d at 564; *In re Shriver,* 33 B.R. 176, 181 (Bankr. N.D. Ohio 1983).

22. Pursuant to section 361 of the Bankruptcy Code, a debtor may provide adequate protection by making a cash or periodic payment to the creditor or providing it with a replacement lien. A secured lender is only entitled to adequate protection up to the value of the collateral supporting its secured claim; it is not entitled to adequate protection for lost opportunity costs. *Gallegos Research Group.*, 193 B.R. at 584-85 (citing *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365 (1988)); *Cann & Saul Steel,* 76 B.R. at 483. The value of BofA's collateral that is owned and being utilized by SHS is unknown, but it is a small number since the personal property at the North Plainfield Property primarily consists of desks, chairs and televisions.[2]

23. Through the use of cash collateral, the Debtors will be able to maintain their operations as a going concern post-petition while protecting and preserving the value of the BofA's collateral. As discussed above, in order to adequately protect BofA's interests during the period of Cash Collateral Budget, the Debtors propose to grant BofA replacement liens pursuant to sections 361 and 363 of the Bankruptcy Code, to the extent that BofA's cash collateral is used

---

[2] By comparison, the assets left behind at the Warren Property, which BofA also has a lien upon, are of significant value, such as the Premises (as defined in the Leasehold Mortgage) and related personal property.

2634834

by the Debtors and any diminution in the value of the BofA's collateral occurs, with the same priority in the Debtors' post-petition collateral, and proceeds thereof, that BofA held in the Debtors' prepetition collateral.[3]

24. In addition, while the Debtors' interest in certain assets located at the Warren Property relating to a leasehold estate and related personal property may have ended, BofA has various remedies at its disposal with respect to those assets, including foreclosing upon the Premises (and related personal property) and/or collecting rent/profits from any tenants utilizing the Premises, including Amedeo's Camp Harmony. The value of the buildings and related personal property at the Warren Property exceeds the amount the Debtors owe BofA. *Cf. In re Snowshoe Company, Inc.*, 789 F.2d 1085 (4th Cir. 1986)(recognizing that equity cushion is a form of adequate protection under section 361 of the Bankruptcy Code.); *In re Monnier Bros.*, 755 F.2d 1336 (8th Cir. 1985)(dictum)(same); *In re Mellor*, 734 F.2d 1396 (9th Cir. 1984)(same); *In re Grant Broadcasting of Philadelphia, Inc.*, 75 B.R. 819 (E.D.Pa. 1987)(same).

25. Through the use of cash collateral, SHS anticipates that it will be able to maintain and enhance the value of their assets for the benefit of BofA, other creditors, and the estate. Thus, the best way to ensure that BofA's security interests are not jeopardized is through the use of its cash collateral. *See In re Aqua Associates*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("The important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized."). The Debtors respectfully submit that the protections proposed herein are appropriate to adequately protect BofA's interests.

---

[3] The cash in the accounts may not be fully encumbered with BofA's lien. The accounts are maintained at another bank and there is no account control agreement in place. Moreover, at this juncture, it is unclear if all the cash in those accounts are derived from BofA's collateral.

26. Not allowing use of cash collateral would have disastrous effects on creditors, employees, the students, and the communities throughout New Jersey that SHS services. SHS is often viewed as a place of last resort for behaviorally classified children, with psychiatric hospitals as the next stop if the students are unable to stay in SHS. For many years, SHS has maintained, as it does now, a clinical department with clinical social workers and a psychiatrist that care for their students. SHS needs the use of cash collateral to continue paying its dedicated workforce and continue serving the students who deserve to be in a place that gives them the opportunity to thrive.

27. By separate application filed simultaneously herewith, the Debtors have requested that the Court shorten the notice period and grant an expedited interim hearing on this Motion and other "first day motions" so that the Debtors have sufficient funds to continue operations and fulfill their mission of educating behaviorally classified students and giving them the opportunity to thrive.

28. Pursuant to Bankruptcy Rule 4001, the Debtors respectfully request that they be authorized to provide notice of the Interim Hearing and the Final Hearing on this Motion by serving a copy of the Motion, together with a copy of the Interim Order by hand, overnight mail, first class mail, facsimile or, to the extent previously agreed by the party to be served, by electronic mail, upon (a) the Office of the United States Trustee, (b) the Debtors' secured creditors, (c) the Internal Revenue Service, (d) the New Jersey Attorney General, (e) the Debtors' consolidated twenty largest unsecured creditors, and (f) all parties that have previously requested notice in this case pursuant to Bankruptcy Rule 2002. The Debtors believe that such notice to such parties is reasonably calculated to inform creditors regarding the emergency relief that is being requested and is sufficient under the circumstances.

## NO PRIOR REQUEST

29. No previous motion for the relief sought herein has been made to this or to any other court.

## WAIVER OF BRIEF

30. As no novel issue of law is raised and the relevant authorities relied upon by the Debtors are set forth herein, the Debtors respectfully request that the requirement under D.N.J. LBR 9013-2 of filing a brief be waived.

## EXTRAORDINARY PROVISIONS OF THE CASH COLLATERAL ORDERS

31. Pursuant to the General Order Adopting Guidelines for Financing Requests, all "extraordinary provisions" contained in a cash collateral or financing order must be disclosed conspicuously in the motion and justification provided therefore. The Debtors are not aware of any "extraordinary provisions" in the proposed Interim and/or Final Orders.

WHEREFORE, the Debtors respectfully request entry of the accompanying Order in the form annexed hereto, and for such other and further relief as is just and proper.

Dated: July 25, 2014

        Respectfully submitted,
        **PORZIO, BROMBERG & NEWMAN, P.C.**
        Proposed Counsel to the Debtors and Debtors-In-Possession

        By: /s/ *John S. Mairo*
              John S. Mairo

# **VERIFICATION**

Ryan Kimmins, being of full age, upon his certification, states as follows:

1. I am the President of Somerset Hills School, Inc. and Somerset Hills Residential Treatment Center, Inc., the above captioned debtors-in-possession.

2. I have read the foregoing Verified Application in Support of Debtors' Motion for Interim and Final Orders Under Sections 361 and 363 of the Bankruptcy Code Approving the Use of Cash Collateral, Providing Adequate Protection and Setting a Final Hearing Pursuant To Bankruptcy Rule 4001 (the "<u>Verified Application</u>").

I hereby verify under penalty of perjury that the Statements contained in the foregoing Verified Application are true.

By: <u>/s/ *Ryan Kimmins*</u>
      Ryan Kimmins

Dated: July 25, 2014

# EXHIBIT A

SOMERSET HILLS RESIDENTIAL TREATMENT CENTER CONSOLIDATED *et al*  
DEBTOR IN POSSESSION  
CASH COLLATERAL BUDGET

DRAFT - TENTATIVE & PRELIMINARY  
SUBJECT TO CHANGE

| CASH BUDGET FOR BUDGET WEEK ENDING >> | 8/1/14 | 8/8/14 | 8/15/14 | 8/22/14 | 8/29/14 | 9/5/14 | 9/12/14 | 9/19/14 | 9/26/14 | 10/3/14 | 10/10/14 | 10/17/14 | 10/24/14 | 13 WEEK TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Position | $518,007 | $548,518 | $485,031 | $517,635 | $403,508 | $358,496 | $248,795 | $268,298 | $337,698 | $254,391 | $305,273 | $230,107 | $298,227 | $518,007 |
| Receipts from School Districts | 73,445 | 73,445 | 73,445 | - | - | 19,056 | 60,344 | 79,400 | 79,400 | 81,782 | 83,370 | 83,370 | 83,370 | 790,427 |
| Other Receipts | 4,034 | - | 3,200 | - | 1,482 | - | 3,200 | - | 1,482 | - | 3,200 | - | 1,482 | 18,080 |
| Total Cash Receipts | 77,479 | 73,445 | 76,645 | - | 1,482 | 19,056 | 63,544 | 79,400 | 80,882 | 81,782 | 86,570 | 83,370 | 84,852 | 808,507 |
| Operating Disbursements | | | | | | | | | | | | | | |
|    Salaries and Payroll related | 16,159 | 116,032 | 14,046 | 114,127 | 16,159 | 107,857 | 14,046 | 10,000 | 133,854 | 10,000 | 131,741 | 10,000 | 127,695 | 821,716 |
|    Liability Insurance | - | - | 2,040 | - | - | - | 2,040 | - | - | - | 2,040 | - | - | 6,120 |
|    Rent | 15,015 | - | - | - | 15,015 | - | - | - | 15,015 | - | - | - | - | 45,045 |
|    YMCA and/or Pool Club | - | - | 1,000 | - | - | - | 1,000 | - | - | - | 1,000 | - | - | 3,000 |
|    Outsourced Computer Svcs. | - | - | 779 | - | - | - | 779 | - | - | - | 779 | - | - | 2,337 |
|    Speech & Occ. Therapy Svcs. | - | - | 6,006 | - | - | - | 6,006 | - | - | - | 6,006 | - | - | 18,018 |
|    Staff Psychiatrist | - | - | 2,820 | - | - | - | 2,820 | - | - | - | 2,820 | - | - | 8,460 |
|    Advertising & Media Svcs. | 2,200 | - | - | - | 2,200 | - | - | - | 2,200 | - | - | - | - | 6,600 |
|    Software | 360 | - | - | - | 360 | - | - | - | 360 | - | - | - | - | 1,080 |
|    Data Processing | 335 | - | - | - | 335 | - | - | - | 335 | - | - | - | - | 1,005 |
|    Contracted Maintenance Services | 474 | - | 4,134 | - | - | - | 4,134 | - | - | - | 4,134 | - | - | 12,876 |
|    Food and kitchen supplies | 5,000 | - | 161 | - | 5,000 | - | 161 | - | 5,000 | - | 161 | - | - | 15,483 |
|    Utilities | 1,104 | - | 4,400 | - | 1,104 | - | 4,400 | - | 1,104 | - | 4,400 | - | - | 16,512 |
|    Misc | 6,000 | - | 294 | - | 6,000 | - | 294 | - | 6,000 | - | 294 | - | - | 18,882 |
| Total Operating Disbursements | 46,647 | 116,032 | 35,680 | 114,127 | 46,173 | 107,857 | 35,680 | 10,000 | 163,868 | 10,000 | 153,375 | 10,000 | 127,695 | 977,134 |
| Operating Cash Flow | 30,832 | (42,587) | 40,965 | (114,127) | (44,691) | (88,801) | 27,864 | 69,400 | (82,986) | 71,782 | (66,805) | 73,370 | (42,843) | (168,627) |
| Financing Disbursements | | | | | | | | | | | | | | |
|    Small Equipment Leases | 321 | - | 861 | - | 321 | - | 861 | - | 321 | - | 861 | - | - | 3,546 |
|    Bank of America - Loan Payments | - | 900 | - | - | - | 900 | - | - | - | 900 | - | - | - | 2,700 |
| Total Financing Disbursements | 321 | 900 | 861 | - | 321 | 900 | 861 | - | 321 | 900 | 861 | - | - | 6,246 |
| Admin Expenses | | | | | | | | | | | | | | |
|    US Trustee | - | - | - | - | - | - | - | - | - | - | - | 5,250 | - | 5,250 |
|    Legal Counsel | - | 20,000 | - | - | - | 20,000 | - | - | - | 20,000 | - | - | - | 60,000 |
|    Financial Advisor | - | - | 7,500 | - | - | - | 7,500 | - | - | - | 7,500 | - | - | 22,500 |
| Total Admin Disbursements | - | 20,000 | 7,500 | - | - | 20,000 | 7,500 | - | - | 20,000 | 7,500 | 5,250 | - | 87,750 |
| Total Disbursements | 46,968 | 136,932 | 44,041 | 114,127 | 46,494 | 128,757 | 44,041 | 10,000 | 164,189 | 30,900 | 161,736 | 15,250 | 127,695 | 1,071,130 |
| Change in Cash | 30,511 | (63,487) | 32,604 | (114,127) | (45,012) | (109,701) | 19,503 | 69,400 | (83,307) | 50,882 | (75,166) | 68,120 | (42,843) | (262,623) |
| Ending Cash Position | $548,518 | $485,031 | $517,635 | $403,508 | $358,496 | $248,795 | $268,298 | $337,698 | $254,391 | $305,273 | $230,107 | $298,227 | $255,384 | $255,384 |

Note:  
  Budgeted amounts are for illustrative purposes and reflect projected receipts and disbursements based on the most current information available, including consideration of seasonal factors.