**PORZIO, BROMBERG & NEWMAN, P.C.**
100 Southgate Parkway
P.O. Box 1997
Morristown, New Jersey 07962
(973) 538-4006
(973) 538-5146 Facsimile
Attorneys Appearing: John S. Mairo, Esq.
                          Kelly D. Curtin, Esq.

*Proposed Counsel to Debtors and Debtors-In-Possession*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| Somerset Hills Residential Treatment Center, Inc., *et al.*, | : Case No.: |
| | : |
|     Debtors-in-Possession. | : (Joint Administration Requested) |

**AFFIDAVIT OF RYAN KIMMINS IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND "FIRST DAY MOTIONS"**

STATE OF NEW JERSEY    )
                                  ) SS.
COUNTY OF SOMERSET     )

    RYAN KIMMINS, of full age, being duly sworn according to law, upon his oath, deposes and states:

    1.    I am the President of Somerset Hills Residential Treatment Center, Inc. ("RTC") and Somerset Hills School, Inc. ("SHS," together with RTC, the "Debtors"). I have served in that role since August 2007 when I became the owner of the Debtors.

    2.    I am fully familiar with the Debtors' business affairs and day-to-day operations, and am duly authorized to make this affidavit on the Debtors' behalf.[1] I submit this affidavit (a) in support of the Debtors' petitions for relief under Chapter 11 of title 11 of the United States

---

[1] The factual statements in this affidavit are based on my personal knowledge, information supplied to me by others under my supervision, my review of relevant documents, and my experience and knowledge of the Debtors' operations and financial condition.

2796699

Code (the "Bankruptcy Code") (b) to assist the Court and other interested parties in understanding the circumstances giving rise to the commencement of these Chapter 11 cases, and (c) to provide general information about the Debtors' business operations that are germane to the Debtors' "First Day Motions" (as defined below). I have reviewed the First Day Motions or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to the uninterrupted operation of the Debtors' businesses and furtherance of their restructuring efforts.

3. Part I of this Affidavit provides an introduction to the Debtors and their Chapter 11 cases. Part II provides an overview of the Debtors' organizational structure and their businesses. Part III describes the circumstances giving rise to the commencement of these Chapter 11 cases. Part IV sets forth a summary of the First Day Motions and the Debtors' intentions for reorganizing and emerging from Chapter 11.

## INTRODUCTION

4. On the date hereof (the "Filing Date"), each of the Debtors filed voluntary petitions for relief pursuant to Chapter 11 of the Bankruptcy Code. Since the Filing Date, the Debtors have remained in possession of their assets and continued to manage their businesses in the ordinary course as debtors in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

5. The Debtors' cases have been initiated to effectuate a reorganization, with the goal of emerging in a strong operational and financial position, and with an enhanced ability to serve its behaviorally classified students with learning disabilities and/or psychiatric diagnoses which are placed by communities throughout the State of New Jersey. The Debtors also seek to use the Chapter 11 process to resolve, in an orderly manner, creditors' claims resulting from the

2796699

termination of a RTC relationship that was tied to a majority of the Debtors' revenues.

## FACTUAL BACKGROUND

### A. The Debtors' Business

6. SHS is a day school for out of district placed classified youth in grades Kindergarten through twelve. Classifications include behavioral/social/emotional disabilities, attention deficit hyperactivity disorder/attention deficit disorder, asperger/autistic spectrum, learning differences, and dyslexia. SHS is approved by the New Jersey Department of Education as a qualified private school.

7. RTC was a residential treatment facility for children classified by the State of New Jersey as behaviorally disabled.

8. SHS is a New Jersey corporation with its principal office located at 1275 Bound Brook Road, Suite 1, Middlesex, New Jersey 08846. RTC is a New Jersey corporation with the same principal office location.

9. SHS and RTC are 100% owned by me.

10. For many years, SHS and RTC operated their businesses at 206 Mount Horeb Road, Warren, New Jersey (the "Warren Property"). At the Warren Property, RTC provided residential services to vulnerable children with mental and emotional issues. The residents from RTC also attended SHS. RTC contracted with the State of New Jersey Department of Children and Families ("DCF") to provide such residential services. The latest such contract was Contract 12GBWR (the "Residential Contract") and covered January 1, 2012 through December 31, 2013. When SHS and RTC were fully operational at the Warren Property, the Debtors employed well over two hundred (200) people and had about one hundred (100) students enrolled at SHS with seventy-six (76) students residing in the RTC. As will be discussed in further detail below, when

3

DCF did not renew the Residential Contract in late November 2013, RTC was delivered a death blow. SHS proactively took steps to remain viable. In January 2014, in an effort driven by a desire to "right size" its business and serve its students and employees, SHS moved its school functions to an excellent educational facility, with larger classrooms located at 107 Westervelt Avenue, North Plainfield, New Jersey (the "North Plainfield Property"). SHS is successfully operating its school at the North Plainfield Property and will continue to do so, but legacy issues related to the RTC business and the non-renewal of the Residential Contract has made this bankruptcy filing necessary.

11. RTC reports on a calendar year basis. For the year ended December 31, 2013, RTC's revenues were $5,488,021.90; for the year ended December 31, 2012, RTC's revenues were $6,728,003. RTC had no operating activity and minimal wrap-up business activity in 2014 because the Residential Contract was not renewed.

12. SHS's fiscal year ends June 30. For the fiscal year ending June 30, 2013, revenue was $8,533,688.48; for the fiscal year ending June 30, 2012, revenue was $8,696,753. For the fiscal year ending June 30, 2014, the revenue is expected to be approximately $4.3 million as a result of the reduction in students enrolled at SHS due to the referral freeze imposed on RTC and the non-renewal of the Residential Contract.

13. As of December 31, 2013, RTC had no employees. As of the Filing Date, SHS has 37 employees, consisting of 35 full-time salaried employees and 2 hourly employees.

B. **Capital Structure**

    i. **Secured Debt**

14. On or about October 26, 2005, SHS entered into an Amended and Restated Mortgage, Construction and Term Loan in the amount of $3,210,000.00 with Bank of America,

4

N.A. ("BofA") (as amended, "Leasehold Mortgage Loan") as evidenced by, among other things, an Amended and Restated Leasehold Mortgage, Construction and Term Loan Agreement dated October 26, 2005 (as amended, "Leasehold Loan Agreement").  RTC executed a guaranty in connection with the Leasehold Mortgage Loan.  The Leasehold Mortgage Loan is secured by the Premises (as defined in the Leasehold Mortgage), which are generally the land, improvements and personal property located at the Warren Property relating to the gym, pool, classroom addition building, and emergency generator building.  Under the relevant documents, assuming the default requirements are met, BofA has the right to, among other things, foreclose on the Premises and collect rents/profits from any tenants using the Premises.  The Premises, as well as the rest of the Warren Property, are currently being used by Camp Harmony ("Amedeo's Camp Harmony"), which is owned by Mr. Jerome Amedeo, who also owns the company that is the Warren Property landlord, School Realty, LLC t/a Home School Realty, LLC (the "Amedeo Landlord Company").  To give a sense of the value of the Premises that are pledged as collateral to BofA, the construction and related costs for the buildings were over $5.6 million.

15. To manage its interest rate risk in connection with the Leasehold Mortgage Loan, SHS entered into an interest rate swap with BofA which hedged its exposure to floating interest rates.  Pursuant to a termination notice, BofA has taken the position that as of the early termination date (June 26, 2014), the termination payment amount due BofA is $254,389.92.

16. On or about March 24, 2009, SHS entered into a $200,000 term loan from BofA (the "2009 Term Loan") as evidenced by, among other things, a Loan Agreement dated March 29, 2009 by and between SHS and BofA ("2009 Loan Agreement").

17. On or about February 25, 2011, SHS entered into a $200,000 term loan from BofA (the "2011 Term Loan" together with the 2009 Term Loan, the "BofA Term Loans") as

evidenced by, among other things, a Loan Agreement dated February 25, 2011 by and between SHS and BofA. The BofA Term Loans were utilized to acquire certain equipment for SHS and RTC. To secure their obligations to BofA under the BofA Term Loans, the Debtors granted BofA a security interest in substantially all the assets of the SHS and RTC. Virtually all of the equipment purchased with the BofA Term Loans remains at the Warren Property.

18. As of the Filing Date, the principal amount due to BofA under the above loans is approximately $1.64 million, comprised of $1,512,398.42 for the Leasehold Mortgage Loan, $16,598.95 for the 2009 Term Loan and $110,593.56 for the 2011 Term Loan.

### ii.     Unsecured Debt

19. As of the Filing Date, the Debtors had unsecured debts in the aggregate amount of approximately $250,000.00 (excluding potential pension liability, the disputed claim of the Amedeo Landlord Company, and deficiency claims).

## FACTORS THAT PRECIPITATED THE DEBTORS' CHAPTER 11 FILING

**A.     Non-Renewal of RTC's Residential Contract**

20. With a forty-five (45) year history and an impressive record of success,[2] the Debtors had two incidents of abuse by staff members in early 2013. The staff members involved were immediately terminated. Nonetheless, on March 7, 2013, the Director of the Division of Children's System of Care ("CSOC") advised that RTC's referrals from sending organizations were suspended until the DCF's "investigation" was complete. Since the inception of the "investigation" and over the ensuing months, RTC fully cooperated with the CSOC.[3]

21. Despite the fact that there were no safety concerns identified by CSOC, RTC

---

[2] With success defined as the youths in RTC's care being thereafter placed and remaining in a less restrictive (i.e., less expensive) environment for the six months following cessation of the services provided by RTC.

[3] The allegations against one of the staff members was later dismissed as unsubstantiated. The allegations against the other staff member remains pending.

6

2796699

agreed to take all corrective measures requested by the CSOC at a considerable expense.[4] CSOC gave RTC false hope that referrals would begin again and that the Residential Contract would be renewed beyond the December 31, 2013 expiration date.

22.   By letter dated November 20, 2013, DCF advised that it would not renew the Residential Contract, which, among other things, violated the 60-day notice provision. Consequently, RTC was forced to close its facilities at the Warren Property effective December 31, 2013.

**B.   Fallout From Termination of the Residential Contract**

23.   SHS had a master lease dated January 27, 1995 (as amended, the "Master Lease") and ground lease dated May 21, 2003 (as amended, the "Ground Lease"; together with the Master Lease, the "Leases") with the Amedeo Landlord Company. The rent payments for the Leases were allocated between SHS and RTC based upon square footage usage. The combined annual lease payments were over $600,000; approximately, $56,000 a month. Due to the closure of RTC, SHS could not sustain such rent payments. The Amedeo Landlord Company was unwilling to negotiate a reduced rent payment consistent with SHS' reduced business structure. Consequently, SHS relocated its school to the North Plainfield Property to best serve its students and employees.

24.   The Amedeo Landlord Company initiated a summary dispossess action against SHS on January 27, 2014, and on February 21, 2014, the parties entered into a Consent to Enter Judgment For Possession.

25.   Also, in February 2014, the Amedeo Landlord Company initiated an action for money damages in the Superior Court of New Jersey, Law Division, Somerset County.

---

[4] SHS/RTC filed a Notice of Claim, dated February 14, 2014, against DCF for an estimated $1.5 million in damages.

Thereafter, the Amedeo Landlord Company filed a motion for summary judgment (returnable July 25, 2014) and the Debtors were concerned that the Amedeo Landlord Company might seek to disrupt SHS's business.

26. Of major consequence due to the Residential Contract non-renewal was that the revenue loss made it impossible for the Debtors to continue funding their pension plan. Pursuant to the pension plan, quarterly payments of approximately $260,000 are due. The Debtors did not make the last quarterly payment and simply will not have the necessary liquidity going forward to make any further payments. The pension plan does have significant funds. At this point, it is unclear what the impact will be on the participants in the pension plan.

27. Additionally, other creditors, including BofA, have contacted the Debtors and demanded payments for past due amounts relating to the Warren Property facilities. In light of the Debtors' reduced revenue, the Debtors need to restructure these obligations in a collective way as opposed to dealing with piecemeal litigation.

## THE PURPOSE OF THE CHAPTER 11 FILINGS

28. Despite the loss of the Residential Contract and its devastating effect on the RTC, SHS has successfully relocated its operations, greatly reducing its rent from approximately $56,000 a month to $12,600 a month, and has been positioned to generate in excess of $3.6 million in annual revenue going forward. In addition to taking the extraordinary step of moving its operations during an extremely difficult, snowy January, SHS has also made prudent decisions to reduce other costs, including laying off employees and reducing certain individual's salaries (including my own). SHS is committed to continuing to provide its students with a safe learning environment that will allow them the opportunity to thrive. SHS has a dedicated, skilled group of professionals that tirelessly work with the children of SHS, which is key to the success

2796699

of the school. While the Debtors recognize this proceeding is needed to address the consequences of the demise of RTC's business, I am determined and committed to see SHS emerge from this Chapter 11 so that SHS can continue serving the best interests of its employees and its behaviorally classified students from multiple New Jersey communities.

29. SHS intends to fund its ongoing operation through ongoing cash collections.

30. To avoid the potentially disruptive impact the commencement of these Chapter 11 cases might have on the Debtors' business operations, to facilitate the Debtors' orderly transition into Chapter 11, and to maintain going concern value while a restructuring is pursued, the Debtors have requested the Court to consider, on an expedited basis, the following substantive motions filed simultaneously with their Chapter 11 petitions (collectively, the "First Day Motions"):

a) Debtors' Motion for Entry of an Order Authorizing the Debtors to Maintain Current Bank Accounts, Maintain Prepetition Cash Management System, Use Existing Business Forms, and Granting a Waiver of the Deposit Guidelines Set Forth in Section 345 of The Bankruptcy Code;

b) Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(A) and 507(A)(4) (I) Authorizing but not Directing Debtors to Pay Prepetition Wages, Salaries and Related Costs, and (II) Directing All Banks to Honor Prepetition Checks For Payment of Prepetition Employee Obligations;

c) Debtors' Motion for Interim and Final Orders (I) Prohibiting Utility Companies from Discontinuing, Altering or Refusing Service on Account of Prepetition Invoices, (II) Deeming Utility Companies to Have Adequate Assurance of Future Payment, and (III) Establishing Procedures For Resolving Requests For Additional Assurance Pursuant to 11 U.S.C. §§ 105(A) and 366;

d) Application of the Debtors Pursuant to Sections 105(A), 327, 328, 330 and 363(C)(1) of the Bankruptcy Code for an Order Authorizing the Debtors to Retain, Employ and Compensate Certain Professionals Utilized by the Debtors in the Ordinary Course Of Business; and

e) Verified Application in Support of Debtors' Motion for Interim and Final Orders Under Sections 361 and 363 of the Bankruptcy Code

2796699

        Approving the Use of Cash Collateral, Providing Adequate Protection and Setting a Final Hearing Pursuant to Bankruptcy Rule 4001.

31.    The purposes of the First Day Motions include, among other things, to: (a) ease the Debtors' transition into Chapter 11 and mitigate potentially adverse effects of the Chapter 11 filings; and (b) minimize disruption of the Debtors' ability to operate in the ordinary course of business. Each of the First Day Motions is crucial to the Debtors' restructuring efforts and preservation of the Debtors' assets and estates.[5]

## CONCLUSION

32.    The First Day Orders will enable the Debtors to stabilize and continue their operating in the ordinary course while the Debtors seek to reorganize under the Bankruptcy Code. Accordingly, the Debtors respectfully request that the Court enter those Orders.

                                          */s/ Ryan Kimmins*
                                          Ryan Kimmins

Sworn and subscribed to
Before me this 25 day of
July, 2014

Lalita Kabse

Notary Public, State of New Jersey
My Commission Expires
August 6, 2017

---

[5] For a more detailed description of the First Day Motions, the Debtors respectfully refer the Court and parties-in interest to the respective First Day Motions.

2796699